NOT FOR PUBLICATION

# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| MAMADOU ALIOU DIENG, | Civil Action No.: 14-5381 (JLL) |
| Plaintiff, | |
| v. | **OPINION** |
| COMPUTER SCIENCE CORPORATION AND JAMES ILLO, | |
| Defendants. | |

**LINARES,** District Judge.

This matter comes before the Court by way of a motion for summary judgment filed by Defendants Computer Sciences Corporation ("CSC" or the "Company") and James Illo (collectively "Defendants"). (ECF No. 38). Plaintiff Mamadou Aliou Dieng ("Plaintiff" or "Dieng") has opposed this motion (ECF No. 43) and Defendants have replied to that opposition (ECF No. 47). The Court decides this matter without oral argument pursuant to Federal Rule of Civil Procedure 78. For the reasons stated herein, Defendants' motion to dismiss Plaintiff's Amended Complaint is granted in part and denied in part.

## BACKGROUND[1]

Plaintiff, Mamadou Alioui Dieng, is a black man from Guinea. (ECF No. 38-1, "Def.'s SOF ¶ 1; ECF No. 43-1, "Pl.'s SOF ¶ 1).[2] Defendant CSC is Plaintiff's former employer. (SOF ¶ 2).

---

[1] Unless otherwise indicated, the information included in this section is deemed undisputed, as taken from the parties' competing statements of facts as well as all other papers before the Court.
[2] As the paragraph numbering of Defendant's Statement of Undisputed Material Facts and Plaintiff's responses thereto generally align, any citation to "SOF" rather than "Def.'s SOF" or "Pl.'s SOF" shall refer to both parties' submissions.

Defendant James Illo is an employee of CSC who worked with Dieng at the Company. (Id.). However, the exact nature of the relationship between Plaintiff and Illo is disputed. (Pl.'s SOF ¶ 2). Plaintiff worked out of the Company's Marlton, New Jersey location, where "CSC supports the Logistics Modernization Program (the "LMP project") for the Department of Defense ("DOD") and Army by supporting and assisting the DOD's integration efforts aimed at sustaining, monitoring, measuring, and improving logistics support for military operations across the nation." (SOF ¶ 3).

In September 2012, Plaintiff was hired by CSC as a Developer on the LMP project. (ECF No. 21, Amended Complaint, "Compl." ¶ 5; ECF No. 23, Def.'s Mov. Br. at 2). From September 2012 through December 2012, Mr. Muhammad El Eid ("El Eid") served as Plaintiff's project manager and people manager. (SOF ¶¶ 22-23). In March 2013, after approximately six months in that position, El Eid recommended that Plaintiff be transferred to the position of open production monitor on a team managed by Ms. Lorelei Hunt ("Hunt"). (SOF ¶¶ 8, 28).

The parties dispute why El Eid made the decision to transfer Plaintiff to Hunt's group. (Pl.'s SOF ¶ 28). The Company argues that "El Eid determined, in his professional judgment and with input from [Plaintiff's prior supervisor] that Plaintiff did not have the skill set necessary to succeed in the Developer role." (Def.'s SOF ¶ 27). In support of this position, CSC cites to the January 2013 Annual Appraisal of Plaintiff's performance, which El Eid prepared. (Def.'s SOF ¶ 26). According to that Appraisal, El Eid rated Plaintiff as only partially meeting expectations in the following four out of eleven categories: Quality of Work Output, Timeliness of Delivery, Use of Resources, and Work Habits. (Id.). El Eid specifically explained that Plaintiff's "work and assignment lacks a great deal of quality;" that Plaintiff "cannot manage his time to work on multiple tasks at the same time" and therefore cannot be assigned multiple tasks at once; and that

Plaintiff "can NOT work on his own when it comes to development." (Id). Plaintiff, for his part, notes that the 2013 performance review contained some positive feedback—namely that he received a "meets/occasionally exceeds" score in the remaining categories and he also states that "El Eid never told him that he had any performance deficiencies" or that such deficiencies were the reason for his transfer. (Pl.'s SOF ¶¶ 26, 28).

After joining Hunt's team, Plaintiff began working with Defendant Illo, the senior Production Monitor. (SOF ¶¶ 33-34). Illo's duties included providing training to Production Monitors and "assigning and monitoring the day-to-day tasks of the other production monitors." (Pl.'s SOF ¶ 10a; SOF ¶ 33). Illo provided training to Plaintiff during Plaintiff's first two months as Production Monitor. (SOF ¶¶ 33-34). Thereafter, Plaintiff received several follow-up training sessions, although the parties dispute why Plaintiff was subject to additional training. (Pl.'s SOF ¶¶ 35-40). Plaintiff contends that all new Production Monitors received supplemental training; however, Defendants maintain that Plaintiff was sent to additional training because his performance was deficient. (Id.).

The Company maintains that "[d]espite the extensive training provided to Plaintiff, after more than six months in the Production Monitor position, Plaintiff's performance was still deficient." (Def.'s SOF ¶ 40). The decision was made to place Plaintiff on a performance improvement plan ("PIP"), although the parties dispute whether it was Hunt or Mr. Kenneth Muss, the Director of Enterprise Services, who decided to place Dieng on a PIP. (SOF ¶¶ 41-42). However, "[a]s Plaintiff had not yet received a formal performance appraisal in his role as Production Monitor, CSC management determined that Plaintiff would need to receive a project appraisal and interim annual appraisal prior to being placed on the PIP." (SOF ¶ 43). To that end, in November 2013, Defendant Illo and Ms. Phyllis Lazev (the individual responsible for assigning certain work to

Production Monitors) both prepared Appraisals of Plaintiff's work. (SOF ¶ 45). Hunt received the Illo and Lazev Appraisals. (Id.). While Illo ranked Plaintiff as below expectations or only partially meets expectations in four categories, Lazev ranked Plaintiff's performance as below expectations or only partially meets expectations in five categories. (SOF ¶¶ 48-49). That same month, Hunt prepared her own Appraisal in which she ranked Plaintiff as falling below expectations in all eleven categories. (SOF ¶ 51).

Defendants contends that Dieng continued to perform deficiently in December 2013 and January 2014. (SOF ¶ 54). Plaintiff met with El Eid in January 2014, at which time he was given the lowest possible performance ranking. (SOF ¶ 57). According to Defendants, "[a]s a result of Plaintiff's poor performance and his 'Does Not Meet Expectations' rating on his Interim Performance Evaluation," El Eid decided to place Plaintiff on a PIP. (Def.'s SOF ¶ 67). The parties do not dispute that Plaintiff was placed on a PIP around February 4, 2014. (SOF ¶¶ 68-69).

Despite having been placed on a PIP, CSC states that Plaintiff continued to perform below expectations. (Def.'s SOF ¶ 71). Defendants offer two specific examples. First, CSC contends that "on February 10, 2014, CSC was forced to restore code that Plaintiff improperly deleted." (Def.'s SOF ¶ 74). Second, CSC alleges that on or around February 13, 2014, in regards to his production monitoring duties, Plaintiff provided wrong information to a client after he reviewed the wrong production environment. (Def.'s SOF ¶ 76). The Company states that "[a]s a consequence of Plaintiff's continued performance deficiencies during the PIP . . . Hunt removed Plaintiff's access to the production systems because Plaintiff's errors were jeopardizing CSC's ability to succeed on the LMP project." (Def.'s SOF ¶ 81). The parties agree that after removing

4

Plaintiff from her team, Hunt contacted Muss to inform him of "significant issues with Mr. Dieng's performance." (SOF ¶ 82).

It is undisputed that on February 21, 2014, Muss decided to terminate Plaintiff effective February 28, 2014. (SOF ¶ 84). While Defendants state that Muss's decision to terminate "was based upon the negative impact on the work environment and risk to CSC caused by Plaintiff's continued poor performance," Dieng notes that "Muss testified that he relied entirely on information provided by Ms. Hunt in making the decision to terminate Mr. Dieng" and that Muss did not "recall ever personally meeting Mr. Dieng or speaking with him." (SOF ¶ 84).

On February 27, 2014, El Eid and Hunt told Plaintiff that the Company decided to terminate his employment. (SOF ¶ 86). It is undisputed that Defendant Illo "did not make the decision to terminate Plaintiff's performance or recommend that he be terminated. In fact, his only involvement in the PIP process was to monitor Plaintiff's completion of the production monitoring tasks and to update Hunt regarding the same." (SOF ¶ 85).

Plaintiff believes that CSC's decision to terminate his employment was based upon race and national origin discrimination rather than the reasons offered by CSC—namely, failing to meet the Company's expectations. Thus, Plaintiff filed the instant action against CSC alleging race and national origin discrimination under the New Jersey Law Against Discrimination ("NJ LAD"), N.J.S.A. 10:5-1, et seq. (Compl. ¶¶ 22, 29). Additionally, Plaintiff maintains that he was also terminated for requesting medical leave to visit his sick mother, and therefore brings claims for retaliation under the NJ Family Leave Act ("NJ FLA"), N.J.S.A. 34:11B-1, et seq., and the Family Medical Leave Act ("FMLA"), 29 U.S.C. § 2601, et seq. (Id. ¶¶ 30-35). The bases for Plaintiff's allegations are discussed in detail below. (Id. ¶¶ 30-35).

## LEGAL STANDARD

Summary judgment is appropriate when, drawing all reasonable inferences in the non-movant's favor, there exists "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986). "[T]he moving party must show that the non-moving party has failed to establish one or more essential elements of its case on which the non-moving party has the burden of proof at trial." *McCabe v. Ernst & Young, LLP*, 494 F.3d 418, 424 (3d Cir. 2007) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986)).

The Court must "view the underlying facts and all reasonable inferences therefrom in the light most favorable to the opposing party." *Pa. Coal Ass'n v. Babbitt*, 63 F.3d 231, 236 (3d Cir. 1995). Moreover, "[i]n determining the appropriateness of summary judgment, the court should not consider the record solely in piecemeal fashion, giving credence to innocent explanations for individual strands of evidence, for a jury . . . would be entitled to view the evidence as a whole." *Abramson v. William Patterson College of New Jersey*, 260 F.3d 265, 285 (3d Cir. 2001) (quoting entirely *Howley v. Town of Stratford*, 217 F.3d 141, 151 (2d Cir. 2000)). If a reasonable juror could return a verdict for the non-moving party regarding material disputed factual issues, summary judgment is not appropriate. *See Anderson*, 477 U.S. at 242-43, 249 ("At the summary judgment stage, the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial.").

## DISCUSSION

### I.   Counts I & II (NJ LAD)

Defendants seeks summary judgment with regards to Dieng's claims of race and national original discrimination under the NJ LAD. (Def.'s Mov. Br. at 11-20).

6

The starting point for an action brought pursuant to the NJ LAD is the framework outlined by the Supreme Court in *McDonnell Douglas Corporation v. Green*, 411 U.S. 792 (1973). *See Monaco v. American General Assur. Co.*, 359 F.3d 296, 300 (3d Cir. 2004) ("The Supreme Court of New Jersey has explained the three-step burden shifting analysis 'as a starting point' for analysis of claims under the NJLAD.") (citing *Bergen Commercial Bank v. Sisler*, 157 N.J. 188, 210 (1999)). The three-step *McDonnell Douglas* analysis proceeds as follows. First, a plaintiff must establish a *prima facie* case of discrimination. *Monaco*, 359 F.3d at 300. To establish a *prima facie* case of discriminatory discharge under the NJ LAD, a plaintiff "must demonstrate: (1) that plaintiff was in a protected class; (2) that plaintiff was otherwise qualified and performing the essential functions of the job; (3) that plaintiff was terminated; and (4) that the employer thereafter sought similarly qualified individuals for the job." *Victor v. State*, 203 N.J. 383, 408-409 (2010).

Assuming a plaintiff meets the *prima facie* case, the burden shifts to the defendant to articulate a legitimate non-discriminatory reason for the adverse employment action. *Monaco*, 359 F.3d at 300. Finally, if the defendant meets its burden, the plaintiff must then "discredit the defendant's proffered reason for its action or adduce evidence that discrimination was more likely than not a motivating or determinative cause of the adverse employment action." *Id.*

## A. Plaintiff's *Prima facie* case of Race and National Origin Discrimination

The parties appear to agree that Plaintiff has offered sufficient evidence by which a reasonable jury could find that he satisfies the first three prongs of his NJ LAD claims. (See Def.'s Mov. Br. at 12-13; Pl.'s Opp. Br. at 15). Defendants argue, however, that Plaintiff cannot satisfy the fourth element of this claim—namely, that Plaintiff was replaced by an individual who was not a member of his protected classes. (Def.'s Mov. Br. at 12-13).

However, the Court finds that Plaintiff has offered sufficient evidence by which a reasonable jury could find that Defendants replaced Plaintiff with employees outside of his race and national origin. Plaintiff has offered an e-mail from Hunt to El Eid dated February 28, 2014—the day immediately after Plaintiff's termination—in which Hunt directs El Eid to "[m]ove Richard Beetschen to . . . Production Monitoring," the same position held by Plaintiff when he was fired. (Pl.'s Opp. Br. at 15; Pl.'s SOF ¶ 115; Meil Cert., Exh. 9).[3]   Additionally, Plaintiff cites to the deposition testimony of Hunt in support of his argument that "Hunt hired two production monitors fresh out of college in December 2013 . . . neither of [whom] were Black or of African descent." (Pl.'s SOF ¶ 87a). Moreover, the parties do not dispute that when the new hires arrived, Plaintiff was removed from a desk in an office and sent to a cubicle, outside of the office. (SOF ¶89).[4]

Defendants argue that "the timing [of this email] alone, without any information regarding the position Beetschen was assuming, is insufficient to create a genuine issue of material fact." (Def.'s Reply Br. at 1). Defendants rely upon a Third Circuit case of *Hyland v. American Intern Group.*, which is distinguishable from the case at bar. 360 Fed. App'x. 365 (3d Cir. 2010) (unpublished). In that case, the Circuit affirmed the district court's finding that plaintiff failed to meet the forth prong of his discrimination case where the alleged replacement employee

---

[3] Defendant argues that the Court may not consider this e-mail as it was attached to the certification of Plaintiff's attorney, who, as a non-party to the communication, could not properly authenticate the document. (Def.'s Reply Br. at 1). While the Court agrees that it may only consider admissible evidence in a motion for summary judgment, Defendant has not argued that this e-mail could not be authenticated by a proper individual at trial and is therefore incapable of being admitted into evidence. See Fed. R. Civ. P. 56(c)(1)(B) ("A party asserting that a fact cannot be or is genuinely disputed must support the assertion by . . . showing that . . . an adversary cannot produce *admissible evidence* to support the fact") (emphasis added); Fed. R. Civ. P.56(c)(2) ("A party may object that the material cited to support or dispute a fact *cannot be presented in a form that would be admissible in evidence*.") (emphasis added); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (2986) ("We do not mean that the nonmoving party must produce evidence in a form that would be admissible at trial in order to avoid summary judgment."). As such, and because Defendant has not specifically challenged the authenticity of the document but rather the way in which it was appended to Plaintiff's opposing brief, the Court will consider the email for purposes of this motion.

[4] Of course, the parties do dispute the rationale behind moving Plaintiff to a cubicle. (See Def.'s Mov. Br. at 19-20; Pl.'s Opp. Br. at 12-13). However, the rationale behind the move is a disputed issue of material fact that is better left to a jury.

"performed functions that [plaintiff] had not performed but did not perform duties that [plaintiff] had performed" and where the replacement's salary was nearly $55,000 greater than plaintiff's, suggesting a material difference in the employees' responsibilities. *Id.* at 367. Here, by contrast, in the February 28, 2014 email, Hunt directs that Beetschen be moved to Production Monitoring—the very same position that Plaintiff was terminated from the day prior. (Meil. Cert., Exh. 9). Finally, Plaintiff's testimony that he "never called and asked anybody if somebody took my place or not" (Dieng Dep. 181:2-3) does not, contrary to Defendant's suggestion (Def.'s Mov. Br. at 12), defeat Plaintiff's *prima facie* claim when presented with other evidence that Plaintiff was replaced by at least one individual outside his protected class.

Having found that Plaintiff can meet the *prima facie* case of his NJ LAD claims, the Court now considers whether Defendants have offered a non-discriminatory reason for discharging Plaintiff.

### B. Defendants' Non-discriminatory Reasons for Terminating Plaintiff

Defendants maintains that "[t]he record evidence establishes that on February 21, 2014, [Mr. Kenneth] Muss, the Director of Enterprise Services, made the decision to terminate Plaintiff's employment (effective February 28, 2014) as a result of Plaintiff's continued performance deficiencies, including serious errors during the PIP process." (Def.'s Mov. Br. at 13). Specifically, the Company cites to the declarations of El Eid and Hunt, who state that Plaintiff's performance was deficient (Def.'s Mov. Br. at 13, n. 45). Defendants also relies upon the declaration and deposition testimony of Muss (ECF No. 38-9, Muss Decl. ¶¶ 4-7; Muss Dep. 15, 36). As discussed in the Section I, *supra*, Defendants have offered additional evidence substantiating these reasons for terminating Plaintiff in the form of poor performance reviews by several supervisors.

9

Accordingly, the Court finds that a reasonable jury could find that the Company met its burden of proving non-discriminatory reasons for Plaintiff's discharge. As such, the Court will now consider the final step of the *McDonnell Douglas* framework. That is, the Court considers whether Plaintiff can offer evidence that the proffered reasons were, in fact, a pretext for a discriminatory discharge.

### C.  Plaintiff's Evidence of Pretext

A plaintiff seeking to avoid summary judgment at the pretext stage must offer sufficient evidence that would "allow a factfinder reasonably to infer that each of the employer's proffered non-discriminatory reasons . . . was either a *post hoc* fabrication or otherwise did not actually motivate the employment action (that is, the proffered reason is a pretext)." *Fuentes v. Perskie*, 32 F.3d 759, 764-765 (3d Cir. 1994). To that end, "the non-moving plaintiff must demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder *could* rationally find them unworthy of credence, . . . and hence infer "that the employer did not act for [the asserted] non-discriminatory reasons." *Id.* (quotations omitted); *see also Greenberg v. Camden Cnty. Vocational Tech. Schs.*, 310 N.J. Super. 189, 200 (N.J. Super. Ct. App. Div. 1998); *see also Venegas v. Cosmetic Essence, L.L.C.*, No. A-4634-13T1, 2015 WL 588403, at *5 (N.J. Super. Ct. App. Div. Feb. 13, 2015). A plaintiff seeking to defeat summary judgment at the pretext stage "cannot simply show that the employer's decision was wrong or mistaken, since the factual dispute at issue is whether discriminatory animus motivated the employer, not whether the employer was wise, shrewd, prudent, or competent." *Fuentes*, 32 F.3d at 765.

Plaintiff challenges CSC's proffered reasons on several grounds. First, Plaintiff attacks the credibility of the Company's proffered reasons in general, arguing that sufficient evidence exists as to whether Plaintiff's performance was deficient. Aside from attempting to demonstrate weaknesses in the Company's rationale for firing him, Plaintiff also argues that the Company was motivated in its termination decision by its animosity toward Plaintiff on account of his race and national origin.

### i.    Plaintiff's Evidence with Regards to his Performance Deficiencies

Plaintiff states that there is conflicting evidence as to his alleged performance deficiencies. (Pl.'s Opp. Br. at 16-18). Plaintiff notes that he received a "Meets Expectations" rating on his last performance evaluation prior to joining Hunt's team, which contradicts CSC's position that Plaintiff's performance was deficient. (Id. at 16-17; Pl.'s SOF ¶ 110). Additionally, Plaintiff was given a raise the month before he was terminated. (Id. at 17; Pl.'s SOF ¶ 110). Moreover, Plaintiff notes that he can challenge the credibility of the Hunt performance review where she gave Plaintiff a far worse rating than that given by two supervisors who had direct contact with Plaintiff and never addressed any performance deficiencies with Plaintiff prior to placing him on a PIP. (Id. at 17; Pl.'s SOF ¶ 51).

As to the reasons Hunt provided for terminating Plaintiff prior to his completion of the PIP, Plaintiff argues that a jury could find that these too lack credibility and are therefore pretextual. (Pl.'s Opp. Br. at 17-18). As discussed above, the Company explains that while Plaintiff was on the PIP, he "received an alert on a system he was required to monitor" and that "when Plaintiff received the alert, he looked in the wrong production environment and, thus, provided the wrong information to the client." (Def's. SOF ¶ 76). However, Plaintiff argues that Defendant Illo is to blame for Plaintiff having provided wrong information to a client because Illo allegedly instructed

11

Plaintiff to look in the wrong production environment.  (Pl.'s Opp. Br. at 17.; Pl.'s SOF ¶ 76).  According to Plaintiff, he advised Hunt that Illo instructed him to look in the wrong production environment, but that she blamed him for the error anyway.  (Pl.'s SOF ¶ 76).  Plaintiff also argues that his error in deleting a code "had no effect on anything in CSC's system because when he realized his mistake, Mr. Dieng called the person responsible for correcting the error and was told it would be fixed and would have no impact."  (Pl.'s Opp. Br. at 17; Pl's. SOF ¶ 75a).

Plaintiff also notes that on January 14, 2014, Hunt emailed El Eid, stating that she had been informed that CSC did not "have any budget for Mamadou after January and he needs to be rolled off Sustainment on January 31."  (Pl.'s SOF ¶ 42a).  Yet, Mr. Muss has testified that he "didn't believe the budget stopped on January 31st for [Plaintiff.]"  (Id.).

For these reasons, Plaintiff states that he can show the "weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable fact finder could find them 'unworthy of credence.'"  (Pl.'s Opp. Br. at 18, quoting *DeWees v. RCN Corp.*, 380 N.J. Super. 511, 528 (N.J. Super. Ct. App. Div. 2005)).

Defendants contend that Dieng cannot show that the reasons given for his termination were a pretext where he "admits that other employees had to correct his work and that he committed several critical errors." (Def.'s Mov. Br. at 14).  However, this argument misses the mark.  "[T]he factual dispute at issue is whether discriminatory animus motivated the employer," and not whether the employer's reasons for terminating Plaintiff were "wise, shrewd, prudent, or competent." *Fuentes*, 32 F.3d at 765.  Stated differently, "'[P]laintiff need not prove that [his race or national origin] was the sole or exclusive consideration' in the determination to discharge him; rather, he need only show 'by a preponderance of the evidence that it made a difference' in that decision." *Bergen Commercial Bank v. Sisler*, 157 N.J. 188, 211 (1999) (quoting *Murray v.*

*Newark Housing Auth.*, 311 N.J. Super. 163, 173-174 (N.J. Super. Ct. Law. Div. 1998)).   To that

end, a plaintiff can establish pretext by showing that the reasons given for his termination, whether

true or not, "did not actually motivate the employment action." *Fuentes*, 32 F.3d at 764-65; *see*

*also Greenberg*, 310 N.J. Super. at 200.

The Court now considers the extent to which Plaintiff can show that CSC's decision to

terminate him was motivated, at least in part, by his race and national origin.

### ii.   Plaintiff's Evidence of Race-Based Discrimination

Plaintiff states that Hunt's bias against black people is evidenced by the fact that "[i]n the

more than 10 years she had been a manger, she had hired numerous people, likely over a hundred"

but that she could not remember having hired a single black employee prior to Plaintiff joining her

team. (Pl.'s Opp. Br. at 20; Pl.'s SOF ¶ 104).[5]

Plaintiff also notes that after Hunt learned about the instant lawsuit, she hired a black

employee. (Pl.'s Opp. Br. at 21; Pl.'s SOF ¶ 105).  According to Plaintiff, Hunt's behavior toward

the other black employee was equally as discriminating.  (Id.).  For example, Plaintiff explains:

(1) that Muss testified that aside from Plaintiff and the black employee hired after Plaintiff initiated

this lawsuit, he could not remember Hunt complaining about the performance of anyone else on

her team; (2) that Hunt placed both black employees on PIPs; (3) that Illo testified that the only

other individual whom he remembers that Hunt placed on PIP was also dark-skinned; and (4) that

the other black employee was also terminated after being placed on PIP.  (SOF ¶ 105).

The Court finds that Plaintiff has offered enough evidence through which a reasonable jury

could find that the reasons offered by CSC for terminating Plaintiff are a pretext for race-based

discrimination.   If the jury were to credit Plaintiff's arguments—premised upon the above

---

[5] The Court has reviewed Hunt's deposition testimony, and notes that Hunt did recall hiring "at least one black production monitor" prior to Plaintiff joining her team.  (Meil Cert., Exh. 2, Hunt Dep. 126:5-6).

evidence—that Hunt was biased against black employees, the jury could reasonably find that Hunt's decision to terminate was based, at least in part, on her discriminatory animus. Accordingly, the Court denies Defendants' motion for summary judgment with respect to Plaintiff's claim of race-based discrimination.

### iii.   Plaintiff's Evidence of National Origin Discrimination

In addition to arguing that he was discriminated against because he is black, Plaintiff alleges that he was discriminated against on account of his national origin.  Plaintiff's national origin argument is based upon the facts that (1) Illo allegedly asked him who had processed his citizenship (Pl.'s Opp. Br. at 6; Pl.'s SOF ¶ 109) and (2) Hunt allegedly laughed at Plaintiff's accent when he spoke (Pl.'s Opp. Br. at 5-6; Pl.' SOF ¶ 101).

Defendants respond that these two accusation alone do not suffice to establish that CSC's decision to terminate him was motivated by discriminatory animus based upon his national origin. (Def.'s Mov. Br. at 18-21).  The Court agrees.  As to the alleged question about Plaintiff's citizenship, this one-time remark, which occurred in April 2013 and about nine months prior to Plaintiff's termination, does not bear upon Plaintiff's national origin; rather, it constitutes a vague remark about Plaintiff's citizenship.  Unlike an employee's national origin, citizenship status is not a protected trait under the NJ LAD.  See N.J.S.A. § 10:5-12.  Even were this question to be construed as a remark targeting Plaintiff's national origin, the Court finds this sole remark, made by an individual who Plaintiff has not alleged made or contributed to the decision to terminate Plaintiff (SOF ¶ 84), is insufficient to support an inference of national origin discrimination. *See Grasso v. West New York Bd. of Educ.*, 364 N.J. Super. 109, 118 (N.J. Super. Ct. App. Div. 2003) ("Federal courts have held that comments by individuals outside the decision making process are considered stray remarks, which on their own are inadequate to support an inference of

discrimination."). Moreover, Plaintiff has not argued that this remark "constitutes admissible evidence of managerial atmosphere and a possible discriminatory intent," which might render the remarks more probative. *Ryder v. Westinghouse Elec. Corp.*, 128 F.3d 128, 133 (3d Cir. 1997) (citing *Walden v. Georgia-Pacific Corp.*, 126 F.3d 506, 520-21 (3d Cir. 1997)).

Similarly, the Court finds that Plaintiff's allegation that Hunt laughed at his accent cannot support an inference of national origin discrimination. As CSC points out, Plaintiff's belief that Hunt's laughter when he spoke was on account of his accent is purely speculative. (Def.'s Mov. Br. at 20). When asked at deposition whether Hunt ever told Plaintiff that she was laughing at his accent, Plaintiff stated that "[s]he never told me, but I can tell." (Meil Cert. Exh. 1, Dieng Dep. 102:2-4). Plaintiff further admitted that Hunt did not make any specific comment about his accent (id. 102:16-18) and that she could have been laughing at the substance of Plaintiff's statements (id. 102:19-25). Plaintiff's mere belief, without any supporting evidence, that Hunt laughed at his accent rather than the content of his words cannot support an inference that Plaintiff was discriminated against based upon his national origin.

For these reasons, the Court finds that Plaintiff has not offered sufficient evidence through which a reasonable jury could find that he was discriminated against based upon his national origin. Plaintiff offers mere speculation to support his claim of national-origin discrimination, and "speculation alone, without more, is insufficient to survive summary judgment." *Torretti v. Main Line Hosp., Inc.*, 580 F.3d 168, 179 n.16 (3d Cir. 2009). Accordingly, the Court grants Defendants' motion for summary judgment as to Plaintiff's claim of national-origin discrimination in violation of the NJ LAD.

**D. Whether Illo "Aided and Abetted CSC's alleged discrimination in violation of the LAD.**

In addition to bringing NJ LAD claims against CSC, Plaintiff alleges that Illo is liable under the NJ LAD for having "aided and abetted [CSC] in discriminating against Plaintiff in violation of the [NJ LAD]." (Compl. ¶ 24).[6]  Defendants argue that the aiding and abetting claim cannot stand because Illo was not Plaintiff's supervisor and because "there is no evidence that Illo substantially assisted in Plaintiff's discharge." (Def.'s Mov. Br. at 21-25).

Under the NJ LAD, it is unlawful "for any person, whether an employer or an employee or not, to aid, abet, incite, compel or coerce the doing of any of the acts forbidden under this act, or to attempt to do so." N.J.S.A. 10:5-12(e).  To establish aider and abettor liability under the NJ LAD,

> a plaintiff must show that "(1) the party whom the defendant aids must perform a wrongful act that causes an injury; (2) the defendant must be generally aware of his role as part of an overall illegal or tortious activity at the time that he provides the assistance; [and] (3) the defendant must knowingly and substantially assist the principal violation."

*Tarr v. Ciasulli*, 181 N.J. 70, 84 (2004) (quoting *Hurley v. Atlantic City Police Dep't*, 174 F.3d 95, 129 (3d Cir. 1999) (internal citations omitted)).

Here, the parties dispute, *inter alia*, whether Plaintiff can satisfy the fourth prong of her aiding and abetting claim—namely, whether there is sufficient evidence from which a reasonable jury could determine that Illo "substantially assisted" in Plaintiff's termination.[7]

---

[6] As the Court has already found that Plaintiff has failed to offer any evidence from which a reasonable jury could find national-origin discrimination, the Court need not consider whether Illo aided and abetted in CSC's alleged discrimination based on Plaintiff's status as a native of Guinea, as alleged by Plaintiff. (Compl. ¶ 28). *See Jackson v. Del River & Bay Auth.*, No. 99-cv-3185, 2001 WL 1689880, at *22 (D.N.J. Nov. 26, 2001) (Simandle, J.) ("If the NJAD does not apply to the employer [ ], then no individual aiding and abetting liability may be found, because an employer's liability must be shown before any supervisory liability for violations can exist.").

[7] The parties also dispute whether, under the law, a non-supervisory employee can be held liable for aider and abettor liability. (Def.'s Mov. Br. at 22-24; Pl.'s Opp. Br. at 22-23).  While Defendants argues that "the LAD only permits individual liability against supervisors" (Def.'s Mov. Br. at 22), Plaintiff states that "there is nothing in the LAD that restricts individual liability to supervisors" (Pl.'s Opp. Br. at 23).  A review of both state and federal case law interpreting the NJ LAD's provision relating to aider and abettor liability makes clear that Defendants have the better

The factors the court must consider to determine whether a defendant provides "substantial assistance" are:

> (1) the nature of the act encouraged, (2) the amount of assistance given by the supervisor, (3) whether the supervisor was present at the time of the asserted harassment, (4) the supervisor's relations to the others, and (5) the state of mind of the supervisor.

*Id. See also Albiaty v. L'Oreal USA Products, Inc.*, No. A-1621-07T3, 2009 WL 1562948, at *10 (N.J. Super. Ct. App. Div. June 5, 2009).

Plaintiff argues that Illo substantially assisted in CSC's discrimination against Plaintiff by allegedly: (1) making the discriminatory remark with regards to Plaintiff's citizenship; (2) failing to provide proper training to Plaintiff; (3) excluding Plaintiff from meetings; (4) allegedly providing wrong instructions to Plaintiff that caused Hunt to blame Plaintiff for an error that was not his fault; and (5) offering a performance review of Plaintiff that was used to justify placing Plaintiff on PIP and terminating him.  (Pl.'s Opp. Br. at 24).

"[A]n individual employee can only be found liable of aiding and abetting if 'actively involved in the discriminatory conduct.'"  *Feraro-Bengle v. Randstad North America, L.P.*, Civ. No. 3-1650, 2006 WL 2524170, *12 (D.N.J. Aug. 30, 2006) (Linares, J.) (quoting *Jones v. Jersey City Med. Ctr.*, 20 F. Supp. 2d 770, 774 (D.N.J. 1998)).  Plaintiff does not argue that Illo held any racial bias against Plaintiff or that Illo made any discriminatory remarks to that effect.  Nor, for that matter, does Plaintiff argue that Illo had knowledge of Hunt's alleged bias against black

---

argument. That is, non-supervisors of a plaintiff may not be liable for aiding and abetting under N.J.S.A. § 10:5-12(e). *See, e.g., Tyson v. CIGNA Corp.*, 918 F. Supp. 836, 841 (D.N.J. 1996) *aff'd*, 149 F.3d 1165 (3d Cir. 1998) ("The few courts that have addressed this issue have generally agreed with our conclusion that non-supervisory employees are not liable."); *see also Herman v. Coastal Corp.*, 348 N.J. Super 1, 28 (N.J. Super. Ct. App. Div. 2002) (holding that an "individual to be liable [under N.J.S.A. 10:5-12(e)] would have to hold a position of supervisor"); *see also Entrot v. BASF Corp.*, 359 N.J. Super. 162, 185 (N.J. Super. Ct. App. Div. 2003).  However, because the Court finds that Plaintiff cannot show that Illo provided "substantial assistance" in the ultimate decision to terminate, the Court need not consider whether Plaintiff can offer sufficient evidence to show that Illo exercised supervisory authority over Plaintiff.

employees. As such, there is no basis from which a reasonable jury could conclude that Illo aided and abetted in the firing of Plaintiff for unlawful means. *See, e.g., Cowher v. Carson & Roberts*, 425 N.J. Super. 285, 304 (N.J. Super. Ct. App. Div. 2012) (granting summary judgment in favor of defendant supervisor as to aiding and abetting claim where plaintiff did not present any evidence of discriminatory conduct on the part of that particular supervisor and noting that "[a]t most, [defendant] was ineffective in curing the conduct that plaintiff claims to have brought to his attention."). Accordingly, the Court finds that the above examples of Illo's assistance in the alleged discriminatory termination "fall[s] well short of the 'active and purposeful conduct' that [the New Jersey Supreme Court] ha[s] held is required to constitute aiding and abetting for purposes of [ ] individual liability." *Cicchetti v. Morris Cnty. Sheriff's Office*, 194 N.J. 563, 565 (2008) (quoting *Tarr*, 181 N.J. at 83)).

For these reasons, the Court grants summary judgment in favor of Defendant Illo with regards to Plaintiff's claims of aiding and abetting liability under the NJ LAD.

## II.    Counts III and IV (NJ FLA and FMLA retaliation claims)

In addition to claiming race and national origin discrimination, Plaintiff alleges that Defendants violated the NJ FLA and the FMLA "[by] terminating Plaintiff because he requested leave to care for a family member with a serious health condition." (Compl. ¶¶ 31, 34).[8]

---

[8] The FMLA provides for the following two types of claims, with distinct statutory frameworks and burdens of proof: (1) interference with one's statutory rights, and (2) retaliation against an employee for invoking same. *See Erdman v. Nationwide Ins. Co.*, 582 F.3d 500, 508 (3d Cir. 2009). Plaintiff has only pleaded a claim of retaliation under the NJ FLA and FMLA. Plaintiff has not pleaded that Defendants interfered with his protected leave rights. (See Compl. ¶¶ 30-35). Yet, in Plaintiff's opposition brief, he appears to assert an interference claim, stating that "whether or not Ms. Hunt interfered with Mr. Dieng's request for family medical leave is a material fact in dispute." (Pl.'s Opp. Br. at 6-7). A plaintiff is not permitted to amend his complaint through new arguments raised in a motion for summary judgment. *See, e.g., Bell v. City of Philadelphia*, 275 Fed. App'x 157, 160 (3d Cir. 2008) (unpublished). Accordingly, to the extent Plaintiff now seeks to argue that Defendants interfered with his right to protected leave, the Court will not consider this argument. *See id.; see also Kumar v. Johnson & Johnson, Inc.*, No. 12-cv-779, 2014 WL 5512549, at *6 (D.N.J. Oct. 31, 2014) (Shipp, J.) (declining to consider an argument raised by plaintiff for the first time in her opposition brief).

Under both statutes, an employee is entitled to up to twelve weeks of protected leave to care for a family member "who has a serious health condition." 29 U.S.C. § 2612(a)(1)(C); N.J.S.A. 34:11B-4. An employer may not terminate or otherwise discriminate against an employee for seeking such leave. 29 U.S.C. § 2615(a)(2); N.J.S.A. 34:11B-9. "Due to the similarity of the [FMLA and NJ FLA], courts apply the same standards and framework to claims under [both statutes]." *Wolpert v. Abbot Laboratories*, 817 F. Supp. 2d 424, 437 (D.N.J. 2011).

"'To assert a retaliation claim, a plaintiff must demonstrate that: (1) he or she is protected under the FMLA [or NJ FLA], (2) he or she suffered an adverse employment action, and (3) the adverse action was causally related to the plaintiff's exercise of his or her [protected leave] rights.'" *Erdman v. Nationwide Ins. Co.*, 582 F.3d 500, 508 (3d Cir. 2009) (quoting district court below) (internal quotations omitted). (quotations omitted) (discussing elements of FMLA claim); *see also DePalma v. Building Inspectors Underwriters*, 350 N.J. Super. 195, 214 (N.J. Super. Ct. App. Div. 2002) (discussing elements of NJ FLA claim).

As with the NJ LAD claims, the *McDonnell Douglas* burden shifting analysis, discussed above, is applied to claims of retaliation under the NJ FLA and FMLA. To reiterate, under this framework, if a plaintiff makes a *prima facie* showing of retaliation, the burden shifts to the defendant to articulate a legitimate non-discriminatory reason for the adverse employment action. *Monaco*, 359 F.3d at 300. Finally, the plaintiff must then "discredit the defendant's proffered reason for its action or adduce evidence that discrimination was more likely than not a motivating or determinative cause of the adverse employment action." *Id.*

First, the parties dispute whether Plaintiff meets a *prima facie* case of retaliation. It is undisputed that Plaintiff has offered sufficient evidence to satisfy the first and second prongs of his retaliation claim. As to the first prong (assertion of rights), in December 2013, Plaintiff

requested four weeks of family leave time to care for his sick mother in Africa. (SOF ¶ 95). Plaintiff alleges Hunt told him that if he took leave he would "find someone sitting at [his] desk." (SOF ¶¶ 96, 107). Moreover, Plaintiff alleges that Hunt provided him with the name of another employee who had been replaced after taking family leave. (Pl.'s Opp. Br. at 26; SOF ¶ 97a). Dieng never took the requested leave. (Id.). It is similarly undisputed that Plaintiff "suffered an adverse employment decision" in satisfaction of the second prong when he was terminated.

With regards to the final element of the *prima facie* claim for retaliation, the parties dispute whether Plaintiff can prove that his termination was causally related to his request for leave. (Def.'s Mov. Br. at 27-28; Pl.'s Opp. Br. at 26). "To demonstrate a *prima facie* case of causation, [a plaintiff] must point to evidence sufficient to create an inference that a causative link exists between [his] FMLA leave and [his] termination." *Lichtenstein v. Univ. of Pittsburgh Med. Ctr.*, 691 F.3d 294, 307 (3d Cir. 2012).

Plaintiff argues that he can show causation by virtue of the temporal proximity between his request for leave and the time that the Company began the process of terminating Plaintiff. The Company contends that the temporal proximity between Plaintiff's request for leave and the Company's decision to terminate is insufficient to create an inference of causation. The Third Circuit has held that "[w]here the temporal proximity between the protected activity and the adverse action is 'unusually suggestive,' it is sufficient standing alone to create an inference of causality to defeat summary judgment." *LeBoon v. Lancaster Jewish Comm. Ctr. Ass'n.*, 503 F.3d 217, 232 (3d Cir. 2007); *see also Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273 (2001). That said, the Third Circuit has stated its "reluctan[ce] to infer a causal connection based on temporal proximity alone." *Budhun v. Reading Hosp. and Med. Ctr.*, 765 F.3d 245, 258 (3d Cir. 2014).

Plaintiff contends that he has shown a causal link between his request for leave and termination by virtue of the temporal proximity between the time he "requested leave in November/December 2013, was thereafter subjected to an Interim Performance Appraisal necessary to put him on a PIP in early January 2014, put on the PIP as a predicate to his termination in early February 2014 and then terminated in late February 2014." (Pl.'s Opp. Br. at 25).  The Court finds this temporal link to be too tenuous to independently support Plaintiff's causation argument.

Although Plaintiff now states that he requested leave in "November/December 2013," the operative Complaint, as well as Plaintiff's responses to Defendant's statement of material facts, indicate that the request for leave took the position that he informed Hunt of his wish to take leave in December 2013, rather than "November/December 2013." (Compl. ¶ 13; Pl.'s SOF ¶ 94).  The Court has reviewed Plaintiff's deposition testimony, however, and does note that he testified that he requested leave of Illo in or around November 2013.  (Meil. Cert., Exh. 1., Dieng Dep. 190:9-194:21).  In any event, Plaintiff has not identified the specific date (be it in November or December 2013) on which he requested leave from Hunt.

The date of this request is significant because as Defendants point out, it is undisputed that the process of placing Plaintiff on a PIP was actually initiated in the early part of November 2013.  (Def.'s Reply Br. at 13-14; SOF ¶¶ 42-45).  At some time prior to November 13, 2014, the Company made the decision to place Plaintiff on a PIP.  (SOF ¶ 42).  However, "[a]s Plaintiff had not yet received a formal performance appraisal in his role as a Production Monitor, CSC management determined that Plaintiff would need to receive a project appraisal and interim annual appraisal prior to being placed on the PIP." (SOF ¶ 43).  To that end, on November 13, 2014, Hunt requested that Illo and Lazev provide her with performance reviews on Plaintiff, which reviews

21

were submitted on November 14 and 15, 2013. (SOF ¶¶ 44-45). Accordingly, Plaintiff's temporal proximity argument falls apart if he cannot show these actions took place *after* he requested leave. Plaintiff cannot rest his *prima facie* case for causation solely on a temporal proximity that he has not sufficiently established.

Where, as here, Plaintiff has not shown that the temporal proximity between his request for leave and the Company placing him on a PIP in anticipation of his termination is "'unusually suggestive,' [courts] ask whether 'the proffered evidence looked at as a whole, may suffice to raise the inference.'" *Lichtenstein*, 691 F.3d at 307 (quoting *LeBoon*, 503 F.3d at 232 (internal quotations omitted)). In this case, Dieng has not set forth any additional evidence to support causation. Hunt's representation to Plaintiff that his job might not be available if he takes leave, and her recognition that another employee who took leave was replaced, while likely relevant to a claim of interference that Plaintiff has not pleaded, do not support the inference of a causal connection between Plaintiff's request for leave and his ultimate termination approximately three months later. It is Plaintiff's position that Hunt told him that "*if*" he takes leave, he will not have a job when he returns. (Pl.'s Opp. Br. at 26). However, it is undisputed that Plaintiff never took leave. Accordingly, the causal chain between Hunt's statements and Dieng's termination has a broken link—specifically, that Plaintiff did not actually take the leave that Hunt suggested might result in his termination.

For the above reasons, the Court grants Defendants' motion for summary judgment with respect to Plaintiff's retaliation claims.

## CONCLUSION

For the reasons stated herein, Defendants' motion for summary judgment is denied in part and granted in part. An appropriate Order accompanies this Opinion.

IT IS SO ORDERED.

DATED:        March 8, 2016

JOSE L. LINARES
UNITED STATES DISTRICT JUD